IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,  :
    Plaintiff,
    v.  :  Case No. 3:18-cr-143
PRISCILLA FUENTES-NEGRETE,  :  JUDGE WALTER H. RICE
    Defendant.  :

DECISION AND ENTRY OVERRULING MOTION
TO SUPPRESS PHYSICAL EVIDENCE (DOC. #26)

Defendant Priscilla Fuentes-Negrete was indicted on one count of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, and five counts of using a cellular telephone to facilitate the commission of that crime. 21 U.S.C. §§ 846, 841(b)(1)(A), 843(b). This matter is currently before the Court on Defendant's Motion to Suppress Physical Evidence. Doc. #26. The Court held an evidentiary hearing on March 12, 2019, the transcript of which is filed at Doc. #31. For the reasons set forth below, the Court OVERRULES Defendant's motion.

I. **Background and Procedural History**

In April of 2018, a confidential source working with Homeland Security Investigations introduced "Diego" to an undercover officer ("UCO"). Diego was looking for a cocaine supplier willing to ship cocaine from Arizona to Ohio. The

UCO initially agreed to provide 5 kilograms of cocaine for $20,000 per kilogram. Diego agreed to pay $20,000 up front. Doc. #31, PageID##168-69. Defendant Priscilla Fuentes-Negrete then contacted the UCO by telephone. She identified herself as Diego's wife, "Luciana," and wired the $20,000 from an account bearing the name of Priscilla Fuentes-Negrete, to the UCO. *Id.* at PageID##169-74.

Diego and the UCO later modified their agreement. Diego agreed to purchase 7 kilograms of cocaine up front for $20,000 per kilogram, a total of $140,000. With the $20,000 deposit, Diego owed a balance of $120,000. In addition, the UCO would front Diego another 5 kilograms. *Id.* at PageID##175-76.

The UCO made the arrangements with "Luciana" (aka Fuentes-Negrete) for the narcotics transaction. It was to occur in Ohio on May 9, 2018. Luciana was to package the money in bundles and conceal it in a cereal box. *Id.* at PageID##177, 183. On the morning of May 9, 2018, Federal Drug Enforcement Administration ("DEA") agents briefed Ohio State Highway Patrol Sergeant Chris Coverstone and Trooper Jason Barhorst about the operation and the meeting location. Coverstone and Barhorst were to provide assistance to the DEA agents. *Id.* at PageID##108, 145, 178.

DEA agents then set up surveillance on Fuentes-Negrete. They observed her and another individual travel in a Cadillac CTS to a storage unit and then to a residence in Troy, Ohio. There, Fuentes-Negrete got into a dark-colored Infinity SUV. Another individual followed her in the Cadillac CTS. They stopped at Troy High School and then headed southbound on I-75. *Id.* at PageID##178-81.

2

Sergeant Coverstone was positioned on the interstate near the Austin Landing exit. Trooper Barhorst and his canine partner, Roy, were nearby. They were in radio contact with the DEA agents. The agents informed Coverstone that Fuentes-Negrete was heading his direction in a dark Infinity SUV, with a silver Cadillac CTS in tandem. *Id.* at PageID#111. As the SUV approached him, he noticed that the windows were darkly tinted. *Id.* He started following Fuentes-Negrete and began to pace her speed, comparing his own speed to hers. She was traveling 74-76 miles per hour in a 65-mile-per-hour zone. The Cadillac was still following her. Coverstone also noticed that the bumper flap on the SUV was flapping under the vehicle. *Id.* at PageID#112.

At 2:04 p.m., Coverstone pulled over Fuentes-Negrete's SUV. He told her that he had done so because of the tinted windows and excessive speed. She was not able to produce a driver's license, registration or proof of insurance for the SUV. She did, however, have her passport. Coverstone noted that she was frantically searching through her purse, was visibly nervous and her hands were shaking. *Id.* at PageID##120-22. Coverstone had Fuentes-Negrete sit in the back of his patrol car while he ran computer checks to verify her identity and measured the tint of the windows on the SUV in order to verify that they did not comply with the law. He also called Trooper Barhorst for assistance. *Id.* at PageID#125-26.

Barhorst arrived at the scene at approximately 2:12 p.m., eight minutes after Coverstone initiated the traffic stop. He performed a canine sniff of the SUV with Roy, a trained and certified drug dog. Roy alerted and indicated for the

3

presence of narcotics. PageID##126-129. During this time, Coverstone was still completing the paperwork from the traffic stop and writing a warning for the window tint and excessive speed. *Id.* at PageID#129.

After Roy alerted and indicated, Coverstone advised Fuentes-Negrete of her Miranda rights. She denied smoking marijuana, but admitted that her friends did. He explained that, because Roy had alerted and indicated, they would be searching the vehicle. She denied having drugs or guns in the SUV. However, when Coverstone asked her if she had large amounts of U.S. currency in the vehicle, he noticed her eyes twitch. *Id.* at PageID##129-30.

Trooper Barhorst found $3500 in currency on the floorboard of the front seat of the SUV. It was held together with a black rubber band. Fuentes-Negrete said that this was her shopping money. *Id.* at PageID##130-31. In the back seat, they discovered a large cereal box, freshly glued, with eleven additional bundles of currency, held together with rubber bands matching that of the bundle found in the front seat. *Id.* at PageID#132. She told the officers that the box did not belong to her. *Id.* at PageID#134. The officers seized all of the currency, a total of $120,000.

Trooper Barhorst also found some marijuana debris in the center console area of the SUV. *Id.* at PageID#135. Fuentes-Negrete was given the written warning and allowed to leave. Thereafter, "Luciana" called the UCO to tell him that she had been stopped by law enforcement officers who had taken everything. *Id.* at PageID##182-83. The next day, Fuentes-Negrete called Sergeant

4

Coverstone. She told him that she now knew who owned the currency found in the back seat. *Id.* at PageID#136. He told her how to file a claim after receiving the notification of forfeiture. She told him that she did not want her name associated with the seizure of the currency. *Id.* at PageID## 137-38.

Fuentes-Negrete was arrested on July 18, 2018, on a Criminal Complaint. She was indicted on October 11, 2018, on one count of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine, and five counts of knowingly and intentionally using a cellular telephone to facilitate the commission of that crime.

On December 20, 2018, she filed a Motion to Suppress Physical Evidence, Doc. #26. She argues that: (1) Officer Coverstone lacked reasonable suspicion that a traffic violation had been committed; (2) the traffic stop details no reasonable articulable suspicion of criminal activity leading to probable cause of a warrantless vehicle search; and (3) the canine sniff does not provide a sufficient basis for the warrantless vehicle search.

The Government filed a Memorandum in Opposition to the Motion to Suppress, Doc. #30. It argues that the excessive window tinting and excessive speed provided probable cause for the traffic stop and that the drug dog's alert provided probable cause to search the SUV under the automobile exception to the warrant requirement. The Government further argues that, independent of the traffic violations and the canine sniff, the stop and the search were justified based on the officers' collective knowledge of Fuentes-Negrete's efforts to purchase

5

large amounts of cocaine. On March 12, 2019, the Court held an evidentiary hearing on the Motion to Suppress. Doc. #31. The parties declined the Court's offer of post-hearing briefing.

## II. Analysis

The Fourth Amendment protects the right of individuals to be free from unreasonable searches and seizures. U.S. Cont. amend. IV. A warrant is required unless one of several exceptions applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). Evidence obtained in violation of the Fourth Amendment is inadmissible. *Weeks v. United States*, 232 U.S. 383, 392 (1914).

### A. Probable Cause Existed for the Traffic Stop

Fuentes-Negrete first argues that the traffic stop was pretextual. She cites the lack of supporting evidence to support the alleged window-tint violation. She also challenges the "pacing" method that Sergeant Coverstone used to determine that she was speeding.

Law enforcement officers who have "probable cause to believe that a traffic violation is occurring" may stop a vehicle without a warrant. This is true "regardless of the officer's subjective motivation for the stop." *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003); *Whren v. United States*, 517 U.S. 806 (1996). Accordingly, "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to stop the vehicle." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

6

Probable cause exists where the facts and circumstances within the officers' knowledge "and of which they had reasonably trustworthy information" are "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (internal quotation omitted).

At the evidentiary hearing, Sergeant Coverstone testified that, based on his 25 years of training and experience, it appeared that the windows on the SUV that Fuentes-Negrete was driving were too dark.  Doc. #31, PageID##116-17.  Ohio law requires the driver's and passenger's side windows in the front of the car to have light transmittance of not less than 50%, plus or minus 3%.  *See* Ohio Administrative Code § 4501-41-03.  When Coverstone measured the window tint during the course of the traffic stop, it was only 18%, thereby confirming his belief.  Doc. #31, PageID#125.

Sergeant Coverstone further testified that, based on a comparison of the speed of the SUV with that of his own vehicle, which has a "certified" speedometer, he was able to determine that Fuentes-Negrete was traveling approximately 74-76 mph, in excess of the posted 65 mph speed limit.  *Id.* at PageID##118-19.

Based on the foregoing, the Court concludes that Sergeant Coverstone had probable cause to believe that Fuentes-Negrete had committed these two traffic violations.  Regardless of whether his true motivation was to stop the SUV to

search for contraband, the traffic stop therefore complied with the requirements of the Fourth Amendment.

### B. Probable Cause to Search Developed During Lawful Duration of Traffic Stop

The next question is whether Coverstone and Barhorst had probable cause to search the vehicle. Fuentes-Negrete maintains that they did not. The Government argues that the canine sniff provided probable cause to search the vehicle for contraband. Roy's certification as a drug-detection dog establishes his reliability. *United States v. Howard*, 621 F.3d 433, 447 (6th Cir. 2010). Roy's alert and indication therefore provides probable cause for the warrantless search. *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012).[1]

The Supreme Court has held that an officer cannot prolong a traffic stop in order to conduct unrelated activities such as a canine sniff. *Rodriguez v. United States*, —U.S.--, 135 S. Ct. 1609, 1614-15 (2015). In this case, however, there is no evidence to support a finding that Sergeant Coverstone improperly delayed the traffic stop to enable the canine sniff. Officer Barhorst arrived on the scene just eight minutes after Coverstone initiated the traffic stop. During that time, Coverstone ran computer checks to verify Fuentes-Negrete's identity and check the vehicle registration. He also measured the window tint on the SUV. He decided to issue a written warning for the window tint violation and speeding. He

---

[1] Roy's alert and indication were later corroborated by the presence of marijuana debris found in the console area of the SUV.

8

was still completing that paperwork when Barhorst and Roy arrived on the scene. Doc. #31, PageID##128-29.

As the Government notes, in any event, the officers would have been justified in delaying the traffic stop to enable the canine sniff based on the fact that, at that point, the officers had a reasonable suspicion that Fuentes-Negrete was involved in drug trafficking activity. *See Rodriguez*, 135 S. Ct. at 1614-15 (noting that traffic stop may be prolonged if officers have reasonable suspicion of criminal activity). Not only had they been briefed about the drug deal that was to take place, but Fuentes-Negrete exhibited numerous nervous behaviors that led the officers to believe that she was engaged in criminal activity.

Based on the foregoing, the Court finds that the warrantless search of the vehicle was justified.

### C. Reasonable Suspicion to Stop Vehicle and Probable Cause to Search Based on Drug-Trafficking Activity

The Court also agrees with the Government that, independent of the traffic violations, the initial stop was justified because the officers, based on their collective knowledge, had reasonable suspicion to believe that Fuentes-Negrete was presently involved in criminal activity. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Moreover, because the officers had probable cause to believe that the SUV contained "contraband or evidence of a crime," the automobile exception to warrant requirement justified the search of the vehicle, regardless of the canine sniff. *Id.*

## III. Conclusion

For the reasons set forth above, the Court OVERRULES Defendant's Motion to Suppress Physical Evidence, Doc. #26.

Date: June 6, 2019

_____
WALTER H. RICE
UNITED STATES DISTRICT JUDGE